**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| L.T., by her guardian, CAJUN SNORTON, as the surviving child of NICHOLAS THOMAS, and CAJUN SNORTON, as administrator of the estate of NICHOLAS THOMAS | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Civil Action File No. 1:17-cv-01036-WMR |
| v. | ) ) | |
| SMYRNA POLICE LIEUTENANT KENNETH OWENS, in his individual capacity, and THE CITY OF SMYRNA, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT KENNETH OWENS' MOTION FOR SUMMARY JUDGMENT

Defendant Kenneth Owens' motion for summary judgment is due to be denied. The problem with Owens' motion is that it takes Owens' testimony in his deposition uncritically as true, disregarding (1) Owens' earlier contradictory description of the events in the course of the shooting's investigation; (2) Smyrna Police Officer Cole's testimony that he was not in danger at the time Owens shot, supposedly to protect Cole; and (3) the forensic and video evidence showing that Owens fatally shot Thomas as Thomas drove away from Owens along an empty straightaway.

# FACTS[1]

On March 24, 2015, Owens, along with Smyrna officers Mark Cole and Chris Graeff and Cobb County Police Department officers Robert Dorsey, Bryan Moore, and Daniel Mangold, went to serve a misdemeanor probation warrant from another county on Nicholas Thomas at his employer, a Goodyear, for technical violations related to an alleged failure to report and failure to pay approximately $100 in probation supervision fees. *See* Plaintiffs' Statement of Additional Material Facts ("PSAMF") ¶ 42.

When the officers arrived, they arranged their vehicles to block the only designated method of entry and exit. PSAMF ¶ 44. Based on the way that officers Cole, Graeff, Owens, and Dorsey parked their vehicles, it was apparently not possible for a vehicle to exit. PSAMF ¶ 45. Further, the other sides of Goodyear were such that it would not be possible for a vehicle—especially not the customized Maserati Thomas was driving—to exit. PSAMF ¶ 46.  Indeed, when Thomas' vehicle eventually made contact with the curb at the northern boundary of the lot, the car was immediately rendered inoperable, with smoke billowing from the car as its tires spun ineffectually. PSAMF ¶ 47.

---

[1] The facts for summary judgment are more fully set out in Plaintiffs' responses to Defendants' two separate statements of material facts and in Plaintiffs' statement of additional material facts, which Plaintiffs incorporate herein. This is a brief summary of the most important facts related to the moments surrounding Owens' use of deadly force.

Before Owens fired the fatal shot that ended Thomas' life, Thomas operated the Maserati so as to avoid officers and arrest. PSAMF ¶ 48. It was readily apparent that Thomas was not trying to strike officers, or anyone else, with the vehicle. PSAMF ¶ 49. Instead, the officers perceived that Thomas was attempting to get as much distance as feasible between himself and the officers, so that he could increase his chances of getting away on foot. PSAMF ¶ 50.

Over the course of approximately 90 seconds, Thomas drove forward three times and backward twice. PSAMF ¶ 51. Before he was fatally shot, his average speed in motion in these passes never exceeded 20 miles per hour. PSAMF ¶ 52. There were four separate occasions when Thomas could have easily struck exposed officers with the vehicle had he elected to do so, but each time Thomas operated the vehicle to avoid officers. PSAMF ¶ 53. Throughout, Thomas drove the vehicle in the middle of the designated driving area of the garage parking lot. PSAMF ¶ 54. At no time did Thomas swerve, and at no time did he steer the vehicle towards officers. PSAMF ¶ 55.

When Thomas came to a stop on the south side of the garage before his final pass forward, Cole made contact with the vehicle, striking it with his asp on the driver's side of the vehicle. PSAMF ¶ 56. At that time, Owens had caught up to the vehicle, and was on the other side of the vehicle, out of its path. PSAMF ¶¶ 57–58. Owens kicked the vehicle. PSAMF ¶ 59. The vehicle stopped for longer

than it had previously, but then it pulled forward for the last time. PSAMF ¶ 60.

Owens chased after the vehicle with Cole coming up behind him. PSAMF ¶ 61. After the vehicle was clearly past them, posing no immediate threat, and as the vehicle pulled into the open west side of the garage parking lot, Owens fired three shots. PSAMF ¶ 62. The position of Owens and the vehicle, along with the trajectories of each shot, are shown below, in a diagram prepared by Plaintiffs' police practices expert, William Harmening:



PSAMF ¶ 63.[2]

Recognizing that he was not in harm's way at the time he fired, Owens testified that he shot to protect Cole. PSAMF ¶ 68. But Cole testified that he did not perceive himself at risk of being hit at that time, testifying repeatedly that Owens "saw something" Cole did not. PSAMF ¶ 69. Indeed, Cole's statements and the video show that Cole ran *behind* Owens as Owens chased after the vehicle. PSAMF ¶ 70. Elsewhere Cole said he was right next to Owens when Owens fired. PSAMF ¶ 38. These facts show that Thomas was objectively not an immediate threat to anyone at the time Owens fired.

## ARGUMENT AND CITATION TO AUTHORITY

Nicholas Thomas is dead, so he cannot tell his side of the story of Owen's shooting into the car he was driving. Nevertheless, on summary judgment the facts must still be construed in Thomas' favor.[3] Indeed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case" once a jury performs its role. *Morton v. Kirkwood*, 707 F.3d 1276, 1280

---

[2] The portion of the Goodyear represented is the southwest corner of the building. Owens' location at the time of the shooting is marked as "1;" Cole's position prior to the vehicle's final movement forward is marked as "4;" and position "3" is where Owens explained he was when the vehicle started to move forward for the final time. PSAMF ¶¶ 65–67.

[3] *Cf. Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) ("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify.").

(11th Cir. 2013) (citing *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009)). Here, taking (1) Owens' description of the shooting from his statements to investigators, (2) the description of events from Cole and the other officers on the scene in their depositions and in the course of the investigation, and (3) the video and forensic evidence; Plaintiffs clearly show that Thomas was shot from behind while driving along a clear driveway with no persons in or near his path. On these facts, the shooting of Nicholas Thomas is a flagrant violation of *Tennessee v. Garner*, *Graham v. Connor*, and an extended line of Eleventh Circuit case law, such that Plaintiffs are entitled to judgment and such that Owens is not shielded by qualified immunity.

The cases that show that Owens's shooting of Thomas was an unreasonable seizure in violation of the Fourth Amendment also demonstrate that Owens is not entitled to qualified immunity because the unlawfulness of his conduct—on Plaintiffs' facts—was clearly established.

## I. Foundational cases: *Graham v. Connor* and *Tennessee v. Garner*

A starting place is *Graham*, which established, first, that claims of excessive force are analyzed under the "objective reasonableness" standard of the Fourth Amendment, 490 U.S. at 388, and second, that, in determining reasonableness, courts should examine "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an

immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

Application of the *Graham* factors points strongly to the conclusion that Owens' use of force violated the Fourth Amendment. The severity of the crime element tips strongly in Thomas' favor. Officers attempted to arrest Thomas for violating the terms of his *misdemeanor* probation. Prior to their pursuit of Thomas, no new crime was alleged. All officers knew was that he failed to report and owed about $100 in probation supervision fees. Once officers pursued Thomas, at the very most, he committed the new offense of *misdemeanor* eluding.[4]

To attempt to justify the use of deadly force, Owens repeatedly asserts that Thomas committed aggravated assault on police officers by virtue of his driving forward and backward in the Goodyear parking lot. That contention is flatly contradicted by the evidence, which shows that Thomas *never* made the slightest contact with any officer, *never* attempted to hit any officer, and *never* altered his trajectory even an inch towards an officer from his regular path forward and

---

[4] O.C.G.A. § 40-6-395 ("It shall be unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer"). Defendant City of Smyrna argued in its brief that Thomas committed felony eluding because he placed the general public at risk of receiving serious injures. *See* Doc. 62-1, at 16 n.31. That is incorrect. First, the "general public" never came near Thomas' vehicle and thus was not in danger of being injured. Second, and more to the point, felony eluding requires an aggravating factor of a felony offense other than a traffic offense, in addition to the statutory terms. *State v. Grant*, 274 Ga. 826, 827 (2002).

back. Indeed, the evidence strongly shows that Thomas repeatedly *stopped before* coming into contact with officers even where he could have easily struck them.

Under Georgia law, Thomas' conduct does not amount to assault. Assault requires a "demonstration of violence."[5] Criminal recklessness or negligence is not enough to find an intent to commit injury, for purposes of assault.[6] It is clear from Thomas' actions in avoiding making any contact with the officers that he lacked any "intention to commit injury on another person."[7] Further, it is clear that Thomas' actions were attempts to avoid apprehension and not done to "intentionally place[ the officer] in reasonable apprehension of immediately receiving a violent injury." *Id.* Thus, the only crime for the purposes of the *Graham* factors was an extant misdemeanor warrant and, possibly, misdemeanor eluding.[8]

---

[5] *Payne v. DeKalb Cty.*, 414 F. Supp. 2d 1158, 1172 (N.D. Ga. 2004) (quoting *Lewis v. State*, 253 Ga. App. 578, 580 (2002)).

[6] *Dunagan v. State*, 269 Ga. 590, 591 (1998), *overruled on other grounds*, *Parker v. State*, 270 Ga. 256 (1998).

[7] *Huguley v. State*, 242 Ga. App. 645, 649 (2000).

[8] As shown in greater detail, *infra*, any crime here was far less serious than in *Vaughan* where the fleeing driver was believed to have stolen a truck, rammed a police car with it, and embarked on a high speed chase on a crowded highway. 343 F.3d at 1326–27. Similarly, any crime dwarfs in comparison to the offenses in *Gilmere v. City of Atlanta, Georgia*, 774 F.2d 1495, 1497 (11th Cir. 1985) where the civil rights plaintiff was suspected of threatening someone with a gun, physically fought officers, and drunkenly lunged for an officer's gun that had fallen onto the ground. In both of those cases, the use of deadly force was found to be clearly barred by existing precedent.

The second *Graham* factor is whether Thomas posed an "immediate threat to the safety of the officers." Taking Plaintiffs' facts as true, Thomas posed no one any immediate threat when Owens shot. The video of the immediate aftermath of the shooting shows the western side of the garage parking lot to be wholly devoid of any persons. *See* Four Camera Composite Goodyear Video, Exhibit A, at 2:25–2:32. Further, the statements of Cole and Owens establish that they were on either side of Thomas' vehicle when it was stopped on the south side of the garage, not in harm's way when Thomas accelerated for the final time. So unconcerned with the danger posed to themselves from the vehicle were they that they approached the car and made physical contact with it by kicking its side and striking it with an asp. The video shows them chasing Thomas' car at the moment of the shooting, not Thomas chasing them down.

Owens cannot transform the second *Graham* factor into a concern for unidentifiable hypothetical persons based on the speculation that Thomas might have left the parking lot in the Maserati and caused serious bodily harm at some later juncture. First, that contention is not supported by the law, as otherwise, any failure to immediately pull over would automatically result in officers' entitlement to use deadly force.[9] Second, the officers repeatedly testified that

---

[9] *See Vaughan*, 343 F.3d at 1326–27, 1330–31 (deadly force was not justified to prevent escape or harm to others despite ramming police car, refusal to pull over,

Thomas' intent was not to hit them but to get enough distance so that he could get a head start for running on foot. Third, the officers testified that there was no way for Thomas to get out of the parking lot with the Maserati because the officers had blocked the only method of ingress and egress. Applying the second *Graham* factor, there was a reasonable possibility that officers would have been forced to engage in a foot chase with Thomas, but when he was shot, Thomas did not pose any immediate threat.

As to the third *Graham* factor, it is clear Thomas was engaged in a quintessential "attempt[] to evade arrest by flight," rather than "actively resisting arrest." Owens does not argue otherwise. *See generally* Doc. 61-1. The evidence is undisputed that Thomas never made contact with any officer or even attempted to do so. Surely, he attempted to flee, but that fact militates against the use of deadly force. As an example of the application of this factor in the deadly force context, *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) is instructive. There, the arrestee had actively resisted arrest, including by "str[iking] the officers multiple times." *Id.* at 1294. But at the time the officer fired, the arrestee had backed up as if "retreating," such that "he was not an 'immediate threat.'"[10] Despite such

accelerating in excess of eighty-five miles per hour because vehicle was not presently posing an immediate danger and could have been tracked).

[10] *Id.* at 1293 (quoting *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009) (holding arrestee was not immediate threat *after* moment of struggle with officers)).

active resistance, the use of deadly force in *Salvato* was found unjustifiable.

Beyond *Graham*, the Supreme Court held in *Tennessee v. Garner*, 471 U.S. 1 (1985), that a police officer may use deadly force to seize a fleeing felony suspect when the officer has given a warning about the possible use of deadly force, if feasible.[11] This requirement was not satisfied in this case. There has been no testimony whatsoever from any officer on the scene or any witness that Owens or any other officer made any attempt to give any warning about the possibility of imminent deadly force. In *Vaughan*, under circumstances where it would have been much more complicated to give a forewarning of force, the lack of warning was independently sufficient to get plaintiff's claim beyond summary judgment. 343 F.3d at 1331.

## II. Clearly established law and similar facts in the Eleventh Circuit

In addition to the *Graham* and *Garner* cases, which should be independently sufficient to clearly establish the unlawfulness of Owens' use of deadly force on a fleeing accused misdemeanant, Plaintiffs show a long line of cases from the Eleventh Circuit Court of Appeals demonstrating that it was clearly established that Owens' use of deadly force was constitutionally

---

[11] The Eleventh Circuit has succinctly stated the Garner rule as follows: "Where the suspect is not a fleeing felon and poses no immediate threat to the officer or others, the use of deadly force is a violation of the suspect's Fourth Amendment rights." *Harrell v. Decatur Cty.*, 22 F. 3d 1570, 1573 (11th Cir. 1994), *vacated on other grounds*, 41 F.3d 1494 (1995) (en banc).

excessive. At bottom, each of these cases stands for, at the very least, that "[u]sing deadly force, without warning, on an unarmed, retreating suspect is excessive." *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015) (explaining that this rule has long been clearly established and denying qualified immunity).[12]

### A. *Vaughan*: A more justified use of force in every material respect

*Vaughan* is perhaps the case that best supports Plaintiffs' entitlement to damages for Thomas' death.[13] The case for the use of deadly force in *Vaughan* was far stronger than it is on Plaintiffs' (or even Owens') facts, and the facts are otherwise materially similar. In *Vaughan*, officers encountered a red pickup truck they believed was stolen earlier that day from a gas station along I-85 south of Atlanta. 343 F.3d at 1327. Officers confirmed the truck's occupants matched the description of the reported thieves, and they decided to make a traffic stop on I-85. *Id.* It was readily apparent that the officers were trying to stop the truck, but it

---

[12] An additional reason to deny qualified immunity is that Owens was not acting in his discretionary capacity because he was unlawfully using a firearm. *See generally* Plaintiff's brief in opposition to Smyrna's motion. "What matters [for this determination] is whether the officer" used "'means that were within his power to utilize.'" *Gaillard*, 562 Fed. App'x at 873 (quoting *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004); *see also Ayers*, 650 Fed. App'x at 714 n.4, 716 (reserving question of whether failure to certify stripped officer of acting in discretionary capacity); *Williams v. Deal*, No. 311-061, 2014 WL 4101225, at *10 (S.D. Ga. Aug. 18, 2014), *rev'd in part on other grounds*, 659 Fed. App'x 580 (11th Cir. 2016) (failure to certify stripped officer of discretionary status).
[13] *Vaughan* is conspicuously absent from the 62 pages of Defendants' summary judgment briefing.

would not yield. *Id.* Instead, "[t]he truck rammed into the back of [the police] cruiser" at highway speeds, and then accelerated even faster. *Id.* The truck reached top speeds of eighty-five miles per hour, while towing "two personal watercraft." *Id.* at 1326–27. One officer then rode alongside the truck and fired into the truck, striking one of the occupants.

In concluding that the use of force was unreasonable on plaintiff's facts and that qualified immunity was inappropriate, the Eleventh Circuit relied on three separate grounds: first, the court found that despite ramming the police cruiser, refusing to yield, and accelerating to eighty-five miles per hour with a trailer, there was insufficient evidence to believe that this "flight presented an immediate threat of serious harm to [officers] or others at the time" of the shooting. *Id.* at 1330. In contrast, here, before he was shot, Thomas did not exceed twenty miles per hour,[14] did not make any contact (much less violent contact) with any officer, and was not on any open road. In both instances, "at the time of the shooting . . . the [vehicle's] lane was clear of traffic." *Id.* Importantly, the court found that the truck drove evasively and "recklessly," but stayed in its lane on its forward trajectory. *Id.* at 1326 & n.2. Similarly, Thomas never deviated from driving forward and backward along the middle of the designated driving portion of the parking lot, never swerving or steering towards officers.

---

[14] Harmening Decl. on Speed, Exhibit O, at ¶ 5.

Second, the court found that the "use of deadly force was not necessary to prevent escape." *Id.* at 1330–31. In reaching that conclusion, the court found that there were two police vehicles in close proximity, that the vehicle was "easily identifiable and could have been tracked," and that "officers could have sought assistance from other jurisdictions," if necessary. *Id.* at 1331. Again, the animating factors in *Vaughan* are more glaringly present here. Not only was Thomas in a custom sports car surrounded by more units at the garage than were on the highway,[15] but here, the facts show that there was no way for Thomas to leave the garage parking lot in the Maserati. When the car finally struck the curb, it was immediately disabled and rendered inoperable, billowing smoke and stuck with its wheels spinning, just as the other officers on the scene knew would happen when they testified that it was apparent there was no way out of the garage in the Maserati.

Third, the court found that it "was feasible" for the officers to have given a warning about using deadly force before so doing, and because there was no warning, the shooting ran afoul of *Garner*. *Id.* Where in *Vaughan*, the officer rode alongside the truck that was speeding on the highway for "thirty to forty-five seconds" before firing, here, Owens was chasing Thomas back and forth in the

---

[15] There were four units on the garage premises and two more in a connected parking lot at Publix. PSMF ¶ 71.

parking lot for approximately 90 seconds[16] without warning him about possible deadly force. Obviously, there were significant problems with hearing any warning when travelling at highway speeds not present here.[17]

**B.** *Morton v. Kirkwood*: **The import of taking nonmovant's facts as true at summary judgment**

Next, there is the Eleventh Circuit's decision in *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013), where the court "ha[d] little difficulty concluding on this record that, if we accept [plaintiff's] account, as we must, [the defendant officer] violated [his] Fourth Amendment right to be free from the use of excessive force." There, the court was faced with very similar claims by law enforcement about their justification for shooting into a moving vehicle operating in a parking lot.

In *Morton*, the defendant officer attempted to justify his shooting by "testif[ying] that Morton accelerated the car while Officer Nugent was standing in front of the car and that he shot Morton to protect Nugent from being struck by the moving vehicle." *Id.* at 1282. This is essentially the same justification that

---

[16] *See* Four Camera Composite Goodyear Video, Exhibit A, at 0:52–2:26 (from first time that Thomas moves vehicle as officers arrive to when Thomas last pulls forward as Owens chases after the car).

[17] Clearly it is not feasible to give forewarning to an armed suspect if his use of force is sudden and immediate, but those are not the facts on summary judgment. Instead, the facts show Owens and other officers repeatedly encountered Thomas when he stopped the vehicle, kicking and striking the stationary vehicle. When Owens fired the fatal shot, no one was in Thomas' path.

Owens has offered in this case: that he shot Thomas to protect Cole who was in the way of Thomas' vehicle as it accelerated forward. The problem for Owens is that, as in *Morton*, as always, the non-movant's facts on summary judgment must be credited. Those facts, taken from Owens' statements, Cole's statements, and the forensic evidence show that when Thomas' vehicle was stopped on the south side of the garage, Owens and Cole were on either side of the Maserati not in the path of travel. When Thomas put the car in gear for the final time, Owens chased after Thomas, shooting into the car after it was past him with Cole bringing up the rear, further away from the vehicle. On these facts, Cole was not in any danger of being struck, just as Nugent was not in any danger of being struck in *Morton*. Applying extant Eleventh Circuit precedent on shooting into moving vehicles, "where the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's use of deadly force." *Id.* at 1283 (denying qualified immunity).[18] Other circuit decisions concur that deadly force was

---

[18] For yet another case on the importance of taking the non-movant's facts as true in evaluating whether a use of force could be justified, see *Lundgren v. McDaniel*, 814 F.2d 600 (11th Cir. 1987).

In *Lundgren*, officers testified that a video store owner sleeping behind the counter had a gun and had shot it. *Id.* The decedent's wife testified it was possible that he fired his gun at the officers. *Id.* However, forensic investigators concluded that there was not physical evidence to support the notion that the storeowner fired a shot. *Id.* Taking that evidence as true at the summary judgment stage, the court found the deadly force unjustified because "the officers without provocation shot at a nondangerous suspect." *Id.* at 603; *accord Porter v.*

objectively unreasonable when the officer was to the side of the moving car or the car had already passed by him—taking the officer out of harm's way—when the officer shot the driver.[19]

### C. *Ayers* and *Gaillard*: Flight that does not pose an immediate threat cannot be met with deadly force

*Ayers v. Harrison*, 650 Fed. App'x 709 (11th Cir. 2016) and *Gaillard v. Commins*, 562 Fed. App'x 870, 877 (11th Cir. 2014) are unpublished cases, and thus do not clearly establish the law for the purposes of qualified immunity. Yet these cases are nevertheless quite instructive for their application of the Fourth Amendment to similar facts of a shooting into a fleeing vehicle in a parking lot and the use of deadly force on a fleeing suspect in a police chase. Similarly, these cases are important for their application of preexisting binding precedent to find that the Fourth Amendment violations were clearly established.

In *Ayers*, plainclothes officers in an unmarked car approached Ayers in a gas station parking lot with their guns drawn to make an arrest. *Id.* at 713. Ayers

_____

*Massarelli*, 303 Ga. App. 91, 93 (2010) (reversing summary judgment and finding "clearly established law provided that an officer's use of deadly force to apprehend a suspect violated the suspect's Fourth Amendment rights where the suspect posed no immediate threat to the officer and no threat to others").

[19] *Godawa v. Byrd*, 798 F.3d 457, 466–67 (6th Cir. 2015); *Hermiz v. City of Southfield*, 484 Fed. App'x 13, 16 (6th Cir. 2012); *Sigley v. City of Parma Heights*, 437 F.3d 527, 531, 537 (6th Cir. 2006); *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005) ("A reasonable jury could conclude that Dunn did not fire as the vehicle was bearing down on him in fear of his life. Instead, a jury could conclude that Dunn fired as he ran toward the driver side of the car after the car passed him.").

put his car in reverse to flee from the officers, but he "did not try to strike or run over any of the officers" *Id.* When the officer fired at Ayers, no officer was in immediate danger of being struck by the car, and Ayers was retreating by travelling in his car away from the officers. *Id.* The facts at summary judgment in this case are significantly similar. Thomas was in a parking lot, trying to avoid arrest by driving away from Owens and Cole when he was shot. At the time he was shot, he was clearly engaged in flight, but no officer was in harm's way.

*Ayers* resolved the officer's claimed entitlement to qualified immunity by citing to *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) and *Lundgren v. McDaniel*, 814 F.2d 600 (11th Cir. 1987) for the commonsense proposition that "using deadly force against an unarmed, nondangerous suspect is unconstitutional." *Ayers*, 650 Fed. App'x at 714. The most significant apparent difference between *Ayers* and the instant case is that in *Ayers* the officers were not in police garb, and Ayers could have believed he was about to be robbed. However, importantly, the reasonableness of a use of force must be judged by "from the perspective of a reasonable officer on the scene," *Young v. Borders*, 850 F.3d 1274, 1279 (11th Cir. 2017) (quoting *Graham*, 490 U.S. 396–97), rather than by the civilian's perspective of how events were unfolding.[20]

*Galliard* dealt with a fleeing felon, suspected of trafficking cocaine, who

---

[20] In *Young*, the civilian perceived a late night burglary in progress at his home.

abandoned a high-speed vehicular chase and took off on foot from law enforcement. 562 Fed. App'x at 872. The arrestee was not apparently armed. *Id.* at 875. On summary judgment, the facts were that an officer struck him with a police vehicle in order to seize him. *Id.* at 873–74. The Eleventh Circuit found the seizure was unreasonable and that the Fourth Amendment violation was clearly established. *Id.* at 875–76. The court found that *Garner* was sufficient to clearly establish the law that "even in a car chase scenario, where the suspect 'did not use or did not threaten to use his car as a weapon,'" deadly force is constitutionally inappropriate.[21] In contrast, where vehicular flight poses an immediate risk to officers or others, the court found the law was not clearly established. *Id.* The facts of this case involve the same straightforward application of law to fact. Because the facts at summary judgment show that Thomas was driving away from officers when he was shot, along an empty side of a garage parking lot from which he could not escape, he did not pose a sufficiently imminent threat to have forfeited his life to the state.

**D.** *Gilmere* **and** *Salvato***: Deadly force unreasonable despite arrestee's violent resistance**

In *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) (en banc) and *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015), the Eleventh Circuit found

---

[21] *Id.* at 876 (citing *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013) and *Vaughan v. Cox*, 343 F.3d 1323, 1327–32 (11th Cir. 2003)).

the use of deadly force against arrestees who were engaged in violent resistance against multiple officers to be unreasonable because officers were not faced with a sufficiently immediate threat of serious bodily harm.

In *Gilmere*, the arrestee had been drunk driving when he almost struck and injured another driver. 774 F.2d at 1496. In an ensuing confrontation with that driver, the arrestee threatened to shoot the driver with a gun he pulled from his trunk. *Id.* Officers then confronted the arrestee at his home, where they were met with active resistance, including "flailing . . . arms" and "br[eaking] free of their hold." *Id.* at 1497. A "scuffle" ensued. The arrestee then reached for an officer's gun. *Id.* at 1497 n.1 His efforts were sufficient to knock the gun to the ground. *Id.* He then lunged for the gun, but did not reach it before being shot and killed. *Id.*

In *Salvato*, the arrestee was in the course of being handcuffed by two officers when he "began to struggle," rising from the ground to his knees, and exchanging blows with officers. 790 F.3d at 1290. When one officer reached for his belt, the arrestee "rushed towards [him] and hit him again." *Id.* When the other officer attempted to intervene, the arrestee, "hit her in the head, knocking her down." *Id.* The arrestee then retreated to a distance of 10-15 feet from the officers, at which point he was shot and killed. *Id.*

Comparing the facts of these two cases to the facts of Thomas' evasion of the officers, and applying the *Graham* factors to the facts, it is readily apparent

that the use of deadly force in *Gilmere* and *Salvato* was more justified than it was in the instant case. In *Gilmere* and *Salvato*, "the crime at issue" was more severe than in this instance. In both instances, there can be no doubt that the arrestees actually assaulted officers, making violent physical contact. In *Gilmere*, the arrestee had earlier threatened a driver with a gun. In contrast, Thomas simply drove back and forth, *avoiding officers* repeatedly as he drove.

In *Gilmere* and *Salvato*, the "immediate threat" was plainly more acute. In *Gilmere*, the arrestee was lunging for a gun after struggling free from officers. And in *Salvato*, the arrestee was only 10-15 feet away after having overpowered two officers, repeatedly hitting them, and knocking the female officer to the ground. In contrast, Thomas was driving away from Owens and Cole at the time he was shot along the empty west side of the garage, where "the [Maserati's] lane was clear of traffic." *Vaughan*, 343 F.3d at 1323.

Finally, regarding "whether he [wa]s actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, it is readily apparent that Thomas was evading arrest by flight, but was not actively resisting arrest as in *Gilmere* and *Salvato*.[22]

---

[22] For yet another Eleventh Circuit case to find deadly force against a violently resisting arrestee excessive, see *Baltimore v. City of Albany*, 183 Fed. App'x 891, 899 (11th Cir. 2006). In that case, the court found the use of a flashlight to strike the arrestee in the head was deadly force that was not justified under the

### E. Defendants' cases stand for the same legal principles, but were decided based on the distinct fact patterns presented

The cases Defendant Owens cites do not change the legal landscape. Instead, those are cases where the facts showed that officers, or the general public, were in acute and immediate risk of serious harm and death absent imminent action. None of those cases provide any counter to the commonsense rule that deadly force cannot be used where the fleeing suspect does not pose an immediate risk of serious harm. Instead, these cases actually support Plaintiffs' entitlement to relief.

Defendants rely principally on *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009), *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007), and *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005). Each of those cases is consistent with the rules set forth earlier. The result was different for the defendant officers in those cases because the facts were different.

*McCullough* involved facts clearly showing an immediate threat of serious harm to officers, making the use of force constitutionally reasonable. There, a truck with a driver suspected of being involved in a drug transaction had been doing sixty plus miles per hour through city streets, fishtailing out of control on

---

circumstances despite an active fight against multiple officers in a crowded area because the initial crime was minor and the arrestee did not pose an immediate threat of serious injury.

wet roads. 559 F.3d at 1202–03. The car then came to a stop and two officers attempted to pin the car in place. *Id.* The truck persisted in revving its engine and spinning its wheels against the police vehicles. *Id.* At that point, one of the officers became pinned within "inches" of the truck as it moved forward and back, struggling to escape. *Id.* That officer yelled that he was "stuck," asking for help. *Id.* At the same time, the other officer had to jump on the hood of his police cruiser to avoid being hit by the truck. *Id.* The police cars were struck repeatedly in the back and forth. *Id.* at 1208. Then, one of the officers reasonably apprehended that shots were coming from inside the vehicle. *Id.* at 1204. On those facts, deadly force was appropriate because the driver was clearly trying to hit the officers and was doing so in a manner that would obviously cause them serious bodily harm.

In *Long*, a father called the police because his son was having a "psychotic episode" that caused the father to hide out in his car away from the son. 508 F.3d at 578. The psychotic son then committed the "criminal act of stealing a police cruiser." *Id.* at 581–82. The fact that the car was "not just any vehicle, but a *police* cruiser," *id.* at 581, was especially significant because the cruiser "would have cloaked him with the apparent authority of a law enforcement officer." *Id.* at 583. The court then cited fourteen published appellate cases were serious harm followed the theft and driving of a police vehicle. *Id.* at 582–83.

*Long*'s treatment of *Vaughan* is perhaps the most instructive here. The court distinguished *Vaughan* (without a hint of criticism), by noting that (1) the officer knew the fleeing driver was in an unstable state of mind (unlike the fleeing driver in *Vaughan*), (2) the fleeing driver had taken a police cruiser with its particular dangers, and (3) the fleeing driver had been given clear verbal warnings about the imminent use of deadly force. *Id.* at 584–85. Those facts were determinative there, as they are here. Furthermore, *Long* is additionally distinguishable because an objectively reasonable officer would have known that Thomas could not have escaped driving the Maserati.

Likewise in *Robinson.* That was a case where a suspect, who had supplied large quantities of heroin to an informant, operated the vehicle to cause "[the officer, to] perceive[] that [the suspect] was attempting to crush him and endanger his life." 415 F.3d at 1256. There, the undisputed facts showed that the officer was two to four feet from the car as it came towards him and was about to be crushed between the suspect's car and another parked car. *Id.* at 1254. These facts led the court to conclude that deadly force was reasonable where the officer had probable cause to believe his life was in danger from a car undisputedly headed directly at him from mere feet away. *Id.* at 1256. Obviously, if Thomas operated the car to crush an officer, this would be a different case. But Thomas' facts show he avoided officers and drove back and forth never attempting to

strike any officer.[23]

## CONCLUSION

On these facts, the law is clearly established that Owens' use of deadly force was constitutionally unreasonable. Summary judgment should be denied.

Respectfully submitted, this 18th day of January, 2019.

> CRAIG T. JONES, P.C.
> /s/Craig T. Jones
> CRAIG T. JONES
> Attorney for Plaintiff
> Georgia Bar Number 399476

---

[23] None of the other cases cited by Owens change the fundamental calculus.

*Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002) involved an arrestee who elbowed an officer to resist arrest, *id.* 1277 n.3, and embarked on a fifteen minute high-speed chase that included swerving directly at officers, driving 50-60 miles per hour through someone's front yard with occupants in the house, driving (without headlights) directly at an elderly motorist on the wrong side of the road, and driving directly at a police car attempting to block the road. *Id.* at 1277. The facts at summary judgment also showed that the arrestee was driving forward directly at officers *at the moment* he was shot. *Id.* at 1278.

In *Wilson v. Parker*, No. 17-15294, 2018 WL 3954222, at *1 (11th Cir. Aug. 17, 2018), the facts at summary judgment showed a near-naked man was screaming in the woods, and then, when confronted by officers, charged at one of them with a five and a half foot long stick, used offensively as a weapon. Further, Wilson's "unpredictable and dangerous" behavior was not just evasiveness and fighting with officers, he was screaming and nearly naked in the woods by himself, which is the kind of unique mentally instability cited by *Long* to distinguish *Vaughan*.

Finally, *Spencer v. City of Orlando*, 725 Fed. App'x 928 (11th Cir. 2018) gets Defendants nowhere because the facts were undisputed that the fleeing driver had, not once but twice, intentionally struck police vehicles attempting to stop him. The arrestee's companion also fled the car with a gun he shot at the officers.

Each of those cases provided officers with sufficient reason to believe that absent deadly force, they were faced with imminent death. On Thomas' facts, no reasonable officer could perceive such an imminent threat.

Post Office 129
Washington, Georgia 30673
(706) 678-2364

                                        MITCHELL & SHAPIRO LLP
                                        */s/Zack Greenamyre*
                                        ZACK GREENAMYRE
                                        Attorney for Plaintiff
                                        Georgia Bar Number 293002

3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305
(404) 812-4747

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Book Antigua 13-point typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the parties and all counsel as follows:

hgray@grsmb.com
dlee@grsmb.com

This 18th day of January, 2019.

/s/ Zack Greenamyre
Zack Greenamyre
Georgia Bar No. 293002